UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ROTHSCHILD BROADCASTING, LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-2794 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| THE LAW OFFICES OF EVAN D. CARB, PLLC, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

D<small>ENYING</small> D<small>EFENDANTS'</small> M<small>OTION TO</small> D<small>ISMISS</small>

**I.  INTRODUCTION**

Rothschild Broadcasting, LLC ("Plaintiff" or "RBLLC") brings this action against Evan D. Carb ("Carb") and The Law Offices of Evan D. Carb, PLLC, (collectively, "Defendants") for legal malpractice, breach of fiduciary duty, and fraud resulting from Carb's representation of Plaintiff regarding sales of radio stations.  Plaintiff alleges, among other things, that Carb undertook legal representation of Plaintiff despite Carb co-owning a company that was actively negotiating a contract with Plaintiff, and that Carb made false representations to Plaintiff that intentionally resulted in a better position for Carb at the expense of Plaintiff.  Defendants move to dismiss the complaint on four grounds: (1) Plaintiff did not adequately plead a claim for legal malpractice, (2) the claim for breach of fiduciary duty is duplicative of the legal-malpractice claim, (3) fraud is not pleaded with particularity, and (4) the punitive damages request fails as a matter of law.  For the reasons given below, Defendants' motion is denied.

## II.  FACTUAL BACKGROUND

The following facts are drawn from Plaintiff's complaint and accepted as true for purposes of this motion to dismiss, except for the facts drawn from the parties' engagement agreement itself.[1]  Plaintiff is a company created in October 2015 by its president and managing member, Robin Rothschild, "to operate radio stations providing live and local broadcasts in and around the Salisbury, Maryland area."  Compl. ¶¶ 13–15.  Specifically, Rothschild created the company to purchase two radio stations—WKTT, an FM station, and WICO, an AM station—along with a production studio and transmitter site.  *Id.* ¶ 17.

Around the same time, Rothschild learned that Miriam Media, Inc. ("MMI"), a company co-owned by Carb, had purchased the rights to FM radio frequency 94.9 for the Newark, Maryland, area (WAMS), and planned to build a transmitter site for it.  *Id.* ¶¶ 20–21, 25.  Opportunities for purchasing standalone FM stations are generally rare in Rothschild's area, and Plaintiff believed that adding additional FM operations beyond WKTT would provide flexibility and other business opportunities.  *Id.* ¶¶ 18, 28.  Accordingly, while negotiating the purchase of WKTT and WICO, Rothschild also began discussions with MMI about executing a time brokerage agreement ("TBA") whereby Plaintiff could broadcast from Plaintiff's soon-to-be-purchased studio on MMI's frequency (WAMS) using the transmitter MMI planned to build.  *Id.*

---

[1] The parties disagree over whether the Court should consider the parties' engagement agreement.  In deciding a Rule 12(b)(6) motion to dismiss, courts "may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the parties."  *Busby v. Cap. One, N.A.*, 932 F. Supp. 2d 114, 133–34 (D.D.C. 2013) (cleaned up).  Plaintiff's complaint does not explicitly incorporate the agreement by reference, but it does reference and describe the agreement.  *See* Compl. ¶¶ 53–54.  It also appears to reference the portion of the agreement that Defendants deem most relevant: "the letter agreement . . . referenced in a single sentence conditions on formal dual representations."  Compl. ¶ 54.  Given at least this reference, the Court considers this document incorporated by reference and will consider it in deciding this motion.

¶ 22.  Plaintiff's acquisition of WKTT and WICO was effectively finalized around February 2016 (with formal FCC approval in May), while discussions with MMI continued regarding WAMS.  *Id.* ¶¶ 29–30, 37.

At this time, Carb "assume[d] the primary role on behalf of MMI in discussions with RBLLC."  *Id.* ¶ 31.  Carb "would have been aware at this time that the WAMS site was in no position to begin transmission operations, requiring significant build, technical, and engineering efforts before either it could be used for transmitting broadcasts or operations would be viable."  *Id.* ¶ 32.  As progress on the deal continued, Carb facilitated certain requests of Plaintiff's and "had begun using RBLLC's building, studio, offices, and employees as if they were MMI's and toward WAMS operations."  *Id.* ¶¶ 34–35.

After Plaintiff completed purchase of WKTT and WICO on May 12, 2016, Plaintiff submitted a proposed letter of intent to Carb about WAMS.  *Id.* ¶ 37.  It "reflected RBLLC's expectation at this time that any necessary construction efforts building out the tower facilities and related equipment at the WAMS site would be completed by June-July 2016, with execution of the agreement shortly thereafter," and contained provisions regarding MMI's responsibility for certain costs.  *Id.* ¶ 38.  Carb "confirm[ed] RBLLC's expectations" about the "WAMS site build efforts and timing, as well as MMI's responsibility for costs," and provided assurances that issues with the WAMS site would be resolved.  *Id.* ¶¶ 40, 43.  But Carb was overseeing MMI's construction efforts and therefore would have known that Plaintiff's expectations and understanding were incorrect.  *Id.* ¶ 41.  Carb concealed, downplayed, or disavowed the technical issues with the WAMS site.  *Id.* ¶ 63.

While negotiations between Plaintiff and MMI (via Carb) about WAMS continued, Carb learned from Rothschild that a potential buyer for WKTT had approached Plaintiff.  *Id.* ¶ 44.

3

Because Plaintiff "was formed for broadcast operations," Plaintiff only wanted to sell its sole FM station if it had a replacement FM station. *Id.* ¶ 45. Carb knew this from communications with Rothschild, and therefore knew that if Plaintiff sold WKTT, WAMS would change from being merely an additional FM station in Plaintiff's portfolio to "a necessary key operational replacement for WKTT." *Id.* ¶ 46. Knowing this, "Carb advised RBLLC that he, through Defendant Law Offices of Evan D. Carb PLLC, could provide attorney services for RBLLC with respect to the potential sale of WKTT, as well as more generally regarding RBLLC's operations of WICO-AM and WKTT." *Id.* ¶ 47. Plaintiff agreed, and "Carb assumed work as attorney and counsel to RBLLC" "around July-August 2016." *Id.* Carb's role as Plaintiff's attorney gave him access to Plaintiff's "confidential information and insider knowledge" and the ability to influence Plaintiff's "business strategic decisions." *Id.* ¶ 49. Plaintiff had the "belief" that as Plaintiff's attorney, Carb would "protect and look out for[] RBLLC's interests broadly, which included the outcome of WAMS." *Id.* ¶ 50.

Despite Carb working as Plaintiff's attorney beginning around July or August 2016, the parties went until mid-November 2016 without a retainer or engagement agreement. *Id.* ¶ 53. The parties "had long been discussing WAMS at one moment and WKTT the next" leading up to the engagement agreement. *Id.* Plaintiff was unable to discern where Carb's role as "'counsel' ended and supposed 'negotiations' began." *Id.* The engagement agreement signed on November 16, 2016, states that it describes Defendants' representation of Plaintiff "concerning stations WICO(AM) and WKTT(FM) at Salisbury, Maryland ('the Stations')." Mot. Dismiss Ex. A, ECF No. 8-2. Among other services, the agreement states that it covers the following: "Contract matters related to the Stations, excluding any agreements between you and Miriam Media concerning the leasing of WAMS(FM), unless on a case by case basis where there shall first

4

have been a conflict waiver provided by all principals of both companies as to that matter." *Id.* "Carb never discussed with or explained to RBLLC" any potential risks created by his co-ownership of MMI. Compl. ¶ 55. He also did not address the scope of his representation, other than in the engagement agreement. *Id.*

Plaintiff and MMI executed the agreement allowing Plaintiff to broadcast on WAMS using MMI's transmitter in February 2017, several months after Plaintiff's expectation of June-July 2016, and the WAMS site only became operational "around April-May 2017," but still with technical problems that Plaintiff had to address with its own resources. *Id.* ¶ 42. If Plaintiff had "any indication that WAMS' broadcast operations were uncertain" or would be delayed until April-May 2017, Plaintiff would not have executed the WAMS agreement and would not have sold WKTT without another prospect to replace it. *Id.* ¶ 58. Without "Carb's intervention as counsel," Plaintiff would not have sold WKTT in reliance on WAMS because Carb "affirmatively assured RBLLC that the WAMS site was under control and proceeding as expected, citing variously work by MMI's engineers." *Id.* ¶¶ 62, 70.

Between August 2016 and May 2017—while Carb was negotiating and effectuating the WAMS agreement with Plaintiff—Carb, in his role as counsel to Plaintiff, facilitated Plaintiff's sale of WKTT, which ultimately closed on May 12, 2017. *Id.* ¶¶ 61, 88. He advised Plaintiff to move forward with the sale of WKTT despite various concerns raised by Plaintiff, including regarding WAMS's development, and the impact that those concerns could have on Plaintiff's business, and at the same time impressed upon Plaintiff the urgency of accepting "eleventh hour changes to the WAMS transaction," discussed further below. *Id.* ¶¶ 67, 69. In response to Plaintiff's concerns, Carb did not discuss with Plaintiff the possibility of halting the WKTT sale

or pursuing alternatives. *Id.* ¶ 70. Trusting Carb's advice, Plaintiff "would formally commit" to sell WKTT in late December 2016. *Id.*¶ 71.

Carb was motivated both by the "discrete financial interest" he had secured in the WKTT transaction as well as his knowledge that Plaintiff's "commitment to [the sale of] WKTT meant a commitment to WAMS, which RBLLC viewed as WKTT's necessary operational and financial replacement under the circumstances." *Id.* ¶ 72. Carb was aware of the pressure on Rothschild and Plaintiff due to the simultaneous WKTT and WAMS deals, including because both were behind schedule. *Id.* ¶ 73. Carb "intended" that Plaintiff would have "distractions from renewed WKTT negotiations," leading to Plaintiff's concerns about WAMS being "obscured and eventually dropped off," and Plaintiff "accept[ing] Defendant[] Carb's assurances." *Id.* ¶ 74.

Shortly after Plaintiff committed to selling WKTT in late December 2016, and before the WAMS agreement's execution in February 2017, Carb submitted an "updated" WAMS agreement to Rothschild which appeared to contain only "tweaks." *Id.* ¶¶ 75, 88. Carb advised Plaintiff that certain vague terms would be addressed in other provisions or addenda. *Id.* ¶ 76. Carb also made misrepresentations to Plaintiff about this new agreement, such as misrepresenting "references to reimbursable expenses" that gave Carb more "control over the types of costs MMI could claim were to be borne by RBLLC." *Id.* ¶ 77. These changes were proposed "within weeks of when the [WAMS] TBA would execute," i.e., February 2017, and Carb "pressure[d] RBLLC's acceptance of the changes." *Id.* ¶ 78. Plaintiff executed the WAMS agreement with Carb's changes. *Id.* ¶ 80.

After the WAMS deal closed, Plaintiff experienced numerous technical problems with the WAMS equipment that were already known to Carb and which Plaintiff's employees needed to fix. *Id.* ¶¶ 81–82. Instead of helping to address the WAMS site issues, Carb focused on

finalizing the WKTT sale as described above. *Id.* ¶ 83. Once the WKTT sale closed, Carb "denied the problems [with WAMS] and refused any payment to RBLLC," citing the WAMS agreement—in particular, the "eleventh-hour changes . . . incorporated per his advice." *Id.* ¶¶ 89, 91. Given that Plaintiff no longer had its WKTT FM station, Plaintiff felt it "had effectively little choice but to continue pushing forward on WAMS for the sake of continued business operations." *Id.* ¶ 92.

Around "June-July 2017," Carb began facilitating Plaintiff's sale of WICO, along with providing further "assurances on the WAMS issues." *Id.* ¶ 94. WICO was sold in August 2017 (with "additional steps required over August and September"), meaning Plaintiff's only remaining income stream came from WAMS. *Id.* ¶ 97. Carb also facilitated an FCC reassignment of equipment from WICO/Plaintiff to WAMS/MMI. *Id.* ¶ 104.

After the sale of WICO, Plaintiff again raised with Carb the technical problems with WAMS, including "cancelled" business that resulted from WAMS blackouts. *Id.* ¶ 98. In August 2017, Carb "reiterated his previous flat refusals and denials," "insult[ed] RBLLC's employees, emphasiz[ed] RBLLC's failures, and assert[ed] MMI's praise and complete lack of responsibility or obligation." *Id.* ¶ 100. Plaintiff continued with its efforts to fix and operate WAMS but also tried unsuccessfully to resolve some of these issues with Carb. *Id.* ¶ 102.

Carb served Plaintiff with a notice of default under the WAMS agreement in September 2017 due to Plaintiff's nonpayment, despite Plaintiff's nonpayment being "predicated on the lack of WAMS operativity" and also despite "non-payments by MMI" to Plaintiff. *Id.* ¶¶ 105–06, 108. On October 3, 2017—one day after Plaintiff formally closed on its sale of WICO, and less than a week after the notice of default—Carb served Plaintiff with a letter terminating the WAMS agreement. *Id.* ¶ 107. Carb "essentially advised" Plaintiff that "execution and

7

acknowledgment was necessary without full payment." *Id.* ¶ 109.  Carb "presented" the document as "an acknowledgment as to the nonpayment amount and that repayment could not be made at the time." *Id.* ¶ 110.  Rothschild signed the acknowledgment "believing she was without choice." *Id.*

But Carb "knew that the termination and its basis were invalid." *Id.* ¶ 111.  He also knew that Plaintiff was in a difficult situation having lost its income-generating stations other than WAMS, and that Plaintiff would not be able to pay the demanded amount, allowing "him to secure the acknowledgment." *Id.* ¶ 113.  The acknowledgment "served as his basis for effectively revoking all RBLLC's rights to payments." *Id.* ¶ 114.  "Within days of Defendant Carb's terminating RBLLC from the WAMS agreement, Defendant Carb made public MMI's deal to sell WAMS." *Id.* ¶ 115.  Plaintiff was not given any proceeds from the sale. *Id.* ¶ 117.  Plaintiff terminated its engagement with Carb in November 2017. *Id.* ¶ 118.

Plaintiff filed its complaint on October 1, 2020.  Defendants' motion to dismiss is fully briefed.  *See* Mem. P. & A. Supp. Defs.' Mot. Dismiss ("Mem."), ECF No. 8-1; Pl.'s Mem. in Opp'n Defs.' Mot. Dismiss ("Opp'n"), ECF No. 9; Reply Mem. P. & A. Supp. Defs.' Mot. Dismiss ("Reply"), ECF No. 10.

### III.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard; it asks whether the plaintiff has properly stated a claim.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient

8

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555. However, a court considering a motion to dismiss presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

## IV. ANALYSIS

Defendants advance four arguments for dismissing Plaintiff's claims. First, they argue that Plaintiff did not adequately plead a claim for legal malpractice. Mem. at 4–11. Second, they argue that Plaintiff's claim for breach of fiduciary duty is duplicative of its legal-malpractice claim. Mem. at 11–13. Third, they argue that Plaintiff did not plead fraud with particularity. Mem. at 13–16. Fourth, they argue that Plaintiff's request for punitive damages fails as a matter of law. Mem. at 16–17. The Court does not agree with these arguments for the reasons explained below, and therefore denies Defendants' motion to dismiss.[2]

---

[2] Neither party presents argument about which jurisdiction's law applies. Based on the parties' citations to D.C. case law, the Court assumes without deciding that D.C. law applies. *See, e.g.*, Mem. at 11 ("In particular, courts applying District of Columbia law should dismiss claims for breach of fiduciary duty that merely restate malpractice claims."); Opp'n at 15

9

### A. Legal Malpractice

First, Defendants argue that Plaintiff did not adequately plead a claim for legal malpractice. Mem. at 4–11. To "state a claim for legal malpractice, a plaintiff must allege plausible facts showing that (1) an attorney-client relationship existed; (2) the attorney breached a duty of reasonable care; (3) causation; and (4) damages." *Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 127 (D.D.C. 2017).

Defendants' argument focuses on the engagement agreement discussed above, which they assert limited their representation to the WICO and WKTT stations and kept the WAMS transaction "outside the scope of Carb Defendants' representation." Mem. at 6–7. According to Defendants, "the crux of Rothschild Broadcasting's legal malpractice claim regarding the WICO and WKTT stations is that Carb Defendants should have advised Rothschild Broadcasting not to proceed with the sale of these stations because it allegedly compromised Rothschild Broadcasting in a separate business transaction with Miriam Media regarding the WAMS station, which was specifically outside the scope of Carb Defendants' representation" based on the engagement agreement. Mem. at 7. Accordingly, Defendants argue that Plaintiff fails to adequately allege causation and damages because Defendants did not represent Plaintiff regarding the WAMS station, and Plaintiff's alleged damages relate to the WAMS station. *See, e.g.*, Mem. at 9 ("All three categories directly relate to Rothschild Broadcasting's failed business transaction with Miriam Media regarding the WAMS station."); *see also* Reply at 3 ("Rothschild Broadcasting retained Carb Defendants to provide legal services regarding WICO and WKTT, yet Rothschild Broadcasting has articulated no breach and no damages for the WKTT and WICO

---

("courts applying D.C. Law have recognized as distinct from the duty of care, the fiduciary duty of loyalty").

matters. Instead, Rothschild Broadcasting incorporates an alleged breach and alleged damages from a third, specifically excluded matter as the foundation of its legal malpractice claim for WICO and WKTT.").

Defendants' argument is essentially that Defendants only represented Plaintiff regarding the WICO and WKTT stations, and therefore any damages stemming from problems relating to the WAMS station cannot properly serve as the damages for a legal-malpractice claim. But even if Defendants' representation was in fact limited to exclude WAMS—a conclusion the Court would not draw at this stage of litigation—Defendants have not shown that Plaintiff has failed to state a claim for legal malpractice. Defendants' theory is that excluding a certain matter from an attorney-client representation protects the attorney from malpractice liability for injuries relating to the excluded matter. Defendants cite no authority to support this proposition. The Court is not convinced that merely because an attorney does not represent a client regarding a specific excluded matter, damages stemming from the attorney's negligence relating to an included matter are ignored because those damages manifest in the excluded matter.

Here, Plaintiff alleges, among other things, that while Defendants were negotiating the sale of WKTT on Plaintiff's behalf, Plaintiff "began raising with Defendant Carb its concerns about moving forward with the WKTT sale should there be operational delays with WAMS; and among other things, RBLLC cited such delays as having the potential to create distinct business and financial problems for RBLLC if it were to sell WKTT." Opp'n at 7. Plaintiff further alleges that, "[i]n response, Defendant Carb discussed neither options of halting the WKTT sales process, nor considering other available interested buyers or alternatives," and "affirmatively assured RBLLC that the WAMS site was under control and proceeding as expected," resulting in Plaintiff following through on the sale. Opp'n at 7–8. Plaintiff alleges that "Defendant Carb

11

knew RBLLC viewed WAMS as WKTT's necessary FM operational and financial replacement if WKTT-FM should sell." Opp'n at 8.  To summarize, Plaintiff alleges at least that Defendants knew that selling WKTT would put Plaintiff in the position of needing to purchase WAMS and advised moving forward with the sale based on assurances about WAMS that Defendants gave to Plaintiff.  In Defendants' words, as stated above: "the crux of Rothschild Broadcasting's legal malpractice claim regarding the WICO and WKTT stations is that Carb Defendants should have advised Rothschild Broadcasting not to proceed with the sale of these stations because it allegedly compromised Rothschild Broadcasting in a separate business transaction with Miriam Media regarding the WAMS station, which was specifically outside the scope of Carb Defendants' representation."  Mem. at 7.

Plaintiff argues that this demonstrates at least failure to "us[e] a reasonable degree of knowledge, care, and skill."  Opp'n at 9 (quoting *Atlanta Channel, Inc. v. Solomon*, No. 15-cv-1823, 2020 WL 4219757, *5 (D.D.C. July 23, 2020)).  Taking the allegations as true, the Court does not see why Plaintiff's malpractice claim must fail as a matter of law.  As noted above, to "state a claim for legal malpractice, a plaintiff must allege plausible facts showing that (1) an attorney-client relationship existed; (2) the attorney breached a duty of reasonable care; (3) causation; and (4) damages."[3]  *Beach TV Props., Inc.*, 254 F. Supp. 3d at 127.  Defendants have not demonstrated that Plaintiff failed to allege any of these elements.

---

[3] Defendants cite the Court's statement that "[r]egarding causation for a legal malpractice case, 'a plaintiff must set forth a plausible statement not only that a breach of duty occurred but that the breach caused the plaintiff to lose a valid claim or defense in the underlying action and that, absent that loss, the underlying claim would have been successful.'"  Mem. at 5 (quoting *Beach TV Props., Inc.*, 254 F. Supp. 3d at 127).  The phrasing of this standard suggests that it is more applicable to litigation-based legal malpractice as opposed to contract-negotiation-based or transactional legal malpractice because there is no underlying legal action when a contract is being negotiated.  *See Frederick v. Wallerich*, 907 N.W.2d 167, 173 (Minn. 2018) ("When the case involves a transactional matter, as here, the final element is necessarily modified; it turns on

For support of their legal theory, Defendants essentially cite only *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52 (D.D.C. 2015), for the proposition that there is no proximate cause "where we would have to speculate about a legal result." *Id.* at 77. But the plaintiff in *Rocha* "fail[ed] to address this argument" and the Court therefore treated it as conceded. *Id.* The *Rocha* case contains no analysis of this issue. Regardless, it is unclear what "legal result" Defendants allude to or why it requires impermissible speculation. Plaintiff alleges at least that "[a]s a direct and proximate result of Defendant Carb's breaches of his duty of care and legal malpractice, . . . Plaintiff suffered substantial damages . . . under a tainted WAMS TBA that RBLLC would never have entered but for Defendant Carb's misconduct." Compl. ¶ 138(a). Plaintiff may or may not be able to ultimately prove these allegations, but for purposes of a motion to dismiss it is not impermissibly speculative. It may be that after discovery and expert testimony the Court will conclude that Plaintiff's claims fail as a matter of law due to a lack of duty under the circumstances, but given the lack of support for Defendants' position as expressed in the briefing thus far, the Court cannot reach such a conclusion at this stage of the litigation.

### B.  Breach of Fiduciary Duty

Second, Defendants argue that Plaintiff's claim for breach of fiduciary duty should be dismissed because it is duplicative of its claim for legal malpractice.[4] Mem. at 11–13.

---

whether the attorney's conduct was the but-for cause of the failure to obtain a more favorable result rather than success or failure in litigation."). Defendants cite no authority that legal-malpractice claims in the District of Columbia fail to cover contract-negotiation-based or transactional legal malpractice, and therefore, at this time, the Court will not dismiss this claim for Plaintiff's failure to plead a lost claim or defense in an underlying action.

[4] Defendants also argue that to the extent Plaintiff's legal-malpractice claim fails as a matter of law, so too should the fiduciary-duty claim. Mem. at 13. Even if this legal relationship between claims was mandated here, the Court does not hold that Plaintiff's legal-malpractice claim fails as a matter of law, as explained above, and therefore will not grant Defendants' motion on this ground.

Defendants rely primarily on quotes and analysis from *North American Catholic Educational Programming Foundation, Inc. v. Womble, Carlyle, Sandridge & Rice, PLLC* ("*NACEPF*"), 887 F. Supp. 2d 78 (D.D.C. 2012). The court in that case dismissed a claim for breach of fiduciary duty as duplicative. The court looked to whether the claims "aris[e] from the same circumstances and seek[] the same relief as a malpractice claim"; "merely restate malpractice claims"; and "would be decided under the same legal standards as one another, and authorize the same form of relief." Mem. at 11–12 (quoting *NACEPF*, 887 F. Supp. 2d at 83–84). Defendants highlight that Plaintiff's fiduciary-duty claim incorporates all preceding paragraphs of the complaint, including the paragraphs describing the legal-malpractice claim. Mem. at 12.

Plaintiff responds that its claim for breach of fiduciary duty "target[s] Defendants' misconduct that fails specifically[] the standards applicable to the duty of loyalty that lawyers owe their clients." Opp'n at 13. Plaintiff points to a D.C. Court of Appeals case that states—after citing *NACEPF*—that "[a] negligence claim . . . should not prevent a factually distinct fiduciary breach cause of action." *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 582 (D.C. 2015) (quoting Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 15.2 (2014 ed.)); *see* Opp'n at 15.

The Court will not grant Defendants' motion to dismiss on this ground. Defendants are correct that Plaintiff's claims for legal malpractice and breach of fiduciary duty carry at least one hallmark used in *NACEPF* to justify dismissal of the fiduciary-duty claims as duplicative. Namely, in the section of the complaint describing Count II—the claim for breach of fiduciary duty—Plaintiff incorporates by reference all earlier paragraphs, including all paragraphs relating to the legal-malpractice claim. But that alone does not seem to capture the motivation behind the cited case law regarding dismissing duplicative fiduciary-duty claims. The goal seems to be to

avoid fiduciary-duty claims that "merely restate malpractice claims." *NACEPF*, 887 F. Supp. 2d at 84 (internal quotation marks omitted); *see Hinton v. Rudasill*, 384 F. App'x 2, 3 (D.C. Cir. 2010) ("appellant cannot recast his malpractice claim as a breach of fiduciary duty claim").

For example, *NACEPF* cites for support *Iacangelo v. Georgetown University*, 760 F. Supp. 2d 63 (D.D.C. 2011), a case regarding medical-malpractice claims. The court there concluded that "[t]he gravamen of th[e] [breach-of-fiduciary-obligations] claim . . . is simply an amalgamation of the medical malpractice and lack of informed consent claims." *Id.* at 65. The plaintiffs pleaded "claims both for medical malpractice/negligence (Count I of the second amended complaint) and for lack of informed consent (Count II of the second amended complaint)," but then also pleaded a claim for breach of fiduciary obligations due to being treated with an unsafe device not approved by the FDA and not disclosing material risks of the treatment. *Id.* at 65. Therefore, "[t]he legal theory for plaintiffs' breach of fiduciary duty claim is entirely encompassed by the theories underpinning plaintiffs' other two claims." *Id.* at 66. This is an example of what the Court believes should be avoided: unnecessarily adding a claim for breach of fiduciary duty based on factual allegations regarding malpractice.

But here, Plaintiff's fiduciary-duty claim does not merely restate a claim for malpractice. Although Plaintiff's complaint references the same facts to support the two claims, the facts alleged include conduct uniquely relevant to a fiduciary-duty claim, such as allegations of divided loyalty and self-serving. This does not appear to be an example of a plaintiff adding a claim for breach of fiduciary duty premised on factual allegations already covered by other claims. If anything, the issue here seems to be that Plaintiff included additional factual allegations to support its malpractice claim that are more naturally suited to a claim for breach of fiduciary duty. That does not justify dismissal of Plaintiff's fiduciary-duty claim as duplicative.

### C.  Fraud

Third, Defendants argue that Plaintiff has not pleaded its fraud claim with particularity. Mem. at 13–16.  As Defendants note in their opening brief,

> "[m]otions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b)" which includes "to ensure that defendants have adequate notice of the charges against them to prepare a defense," to "discourage suits brought solely for their nuisance value or as frivolous accusations of moral turpitude," and to "protect reputations of professionals from scurrilous and baseless allegations of fraud."

Mem. at 13–14 (alteration in original) (quoting *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 133–34 (D.D.C. 2010)).  A "plaintiff must plead with sufficient particularity the following elements for a viable fraud claim: '(1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action . . . taken in reliance upon the representation.'"  *Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 30 (D.D.C. 2014) (alteration in original) (quoting *Lee v. Bos*, 874 F. Supp. 2d 3, 5–6 (D.D.C. 2012)).  "Thus, a plaintiff 'must allege with particularity matters such as the time, location and content of the alleged misrepresentations . . . [and] misrepresented facts.'"  *Id.* (alterations in original) (quoting *Lee*, 874 F. Supp. 2d at 6).  "[A]lthough Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years, defendants must be able to defend against the charge and not just deny that they have done anything wrong."  *United States ex rel. Westrick*, 685 F. Supp. 2d at 134 (internal quotation marks omitted).

Defendants argue that Plaintiff's "allegations regarding the alleged fraud are presented in summary fashion," without the "specific dates, location, or specific content of the alleged misrepresentations and misrepresented facts" necessary to meet the "demanding pleading standard of Rule 9(b)."  Mem. at 14–15.  Defendants quote several generic-sounding passages

16

from the complaint to demonstrate Plaintiff's lack of particularity.  *See, e.g.*, Mem. at 15 ("[r]epresentations and intentional omissions during the relevant period" (quoting Compl. ¶ 156)).  According to Defendants, Plaintiff only provides a formulaic recitation of the elements of fraud while "fail[ing] to plead with particularity what material facts are at issue in the alleged misrepresentations, how Carb Defendants made the representations with the intent to deceive, and what action was taken in reliance upon the alleged misrepresentations."  Mem. at 15–16.

Plaintiff responds that its complaint contains "adequate notice of the specifics" of its fraud claim.  Opp'n at 22 (quoting *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 79 (D.D.C. 2005)).  Plaintiff points to its identification of "August 2016 to October 2017" as "the dates of the general fraud" that began "with the fraudulently-procured engagement and ending around and after the period[] in which Defendant Carb terminated RBLLC from the WAMS TBA and then sold WAMS."  Opp'n at 21.  Plaintiff also highlights several other aspects of the complaint that it believes shows sufficient details.  *See, e.g.*, Opp'n at 21–22 n.1 (collecting citations to fraudulent misrepresentations).

The Court will not grant Defendants' motion to dismiss the fraud claim for lack of particularity.  Although many of the complaint's allegations could be clearer and more particularized, there are sufficient allegations in the complaint of at least one fraudulent course of action such that Defendants cannot say that they do not have adequate notice of the charges against them to prepare a defense.  The complaint alleges that Carb intentionally misrepresented the state of WAMS's development to encourage Plaintiff's sale of WKTT, making Plaintiff more reliant on WAMS and therefore benefiting Carb.  *See, e.g.*, Compl. ¶ 64 ("Throughout 2016 and into early 2017, Defendant Carb had been overseeing the efforts on the WAMS site, and the engineering team on behalf of MMI . . . ."); ¶ 156(b) (alleging "[r]epresentations, and in

17

particular, those during October 2016 to January 2017, regarding the sufficiency and competence of technological and engineering efforts by MMI toward the WAMS site construction, and the readiness and/or operative status of the WAMS site as anticipated by RBLLC, even though Defendant Carb knew the WAMS site was deficient operationally and by construction"); *id.* ¶ 157 (alleging that Defendants' false representations were "for purposes of misusing the representation and RBLLC's confidence and trust to induce RBLLC's disadvantaged commitment under the WAMS agreement, under which RBLLC would be misled into carrying the financial and operational burdens, ultimately leading to financial benefits for Defendant Carb, and only significant losses to RBLLC").  Plaintiff does not provide granular information regarding the time, location, or content of specific misrepresentations.  But as Defendants acknowledge, "Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years."  Mem. at 14 (quoting *United States ex rel. Westrick*, 685 F. Supp. 2d at 134).  Plaintiff has alleged enough to put Defendants on notice of this allegedly fraudulent course of conduct such that Rule 9's particularity requirement for fraud is met.

It is possible that certain subsets of Plaintiff's fraud allegations do not meet the particularity standard.  Plaintiff's complaint includes eleven sub-paragraphs describing alleged "material misrepresentations."  Compl. ¶ 156.  But Defendants did not move to dismiss Plaintiff's fraud claim in part based on any specific subset of allegations.  Although Defendants cite several specific paragraphs, those are only cited as examples of Plaintiff's allegations lacking "particular dates . . . or the particular quoted content of the alleged misrepresentation."  Mem. at 15.  Defendants move to dismiss the entire fraud claim.  *See id.* at 16 ("Thus, Rothschild Broadcasting cannot maintain its fraud claim.").  Therefore, because the Court holds that

Plaintiff adequately pleads facts that would support a fraud claim, the Court will not grant Defendants' motion to dismiss Plaintiff's fraud claim.[5]

### D.  Punitive Damages

Fourth and last, Defendants briefly argue that Plaintiff's request for punitive damages fails as a matter of law because "[p]unitive damages are a disfavored remedy" and Plaintiff's "summary accusations of alleged intentional, willful, and wanton conduct are unsupported" and "conclusory." Mem. at 16–17. Plaintiff responds that the complaint contains sufficient allegations to support punitive damages, such as Defendants' knowledge of the conflicts of interest and actions taken in bad faith for their own benefit. *See* Opp'n at 23–24. Plaintiff also responds that "a decision on the issue of punitive damages is certainly premature at this stage of the proceedings." *Id.* at 24.

The Court will not grant Defendants' motion to dismiss Plaintiff's request for punitive damages. Defendants present limited analysis attempting to show that Plaintiff's request for punitive damages cannot succeed as a matter of law. They do not grapple with the allegations discussed above—and accepted as true for purposes of this motion to dismiss—that Defendants entered into representation of Plaintiff despite knowledge of conflicts of interest, and then used their representation of Plaintiff to benefit themselves. Accordingly, Defendants have not demonstrated that, as a matter of law, Plaintiff's request for punitive damages cannot succeed.

---

[5] Defendants also argue that Plaintiff failed to plead injury from reliance on the alleged misrepresentations because the fraud section of the complaint cross-references the damages paragraph from the legal-malpractice section of the complaint. Mem. at 16. But Defendants do not cite any authority to support their argument that overlapping damages claims justify dismissal. Given that claimants may plead in the alternative, the Court will not grant the motion on this ground absent supporting authority to the contrary.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 8) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 17, 2021              RUDOLPH CONTRERAS
                                        United States District Judge